Good morning, your honors. I'd like to reserve four minutes if I could, please. You'll have to help keep track of your time. Thank you very much. This is a case involving a paramedic, as you well know, who was certified as a paramedic under Washington's very unique system. They had a dual, basically a dual system, and he was certified, as you know, under the King County EMS program through the obviously one of the central issues of the case deals with whether or not Brian had a property interest in his certificate, as it played out here. Well, his certificate was never revoked, correct? His certificate was modified, because in the state of Washington, under the system that exists, which is very unique for paramedics, it's a two-step process. A certificate has to be obtained through testing and training, and once that is obtained, you may not apply that certificate, use the certificate, unless you have the permission. Okay, I'll ask the question again. The first step is certification. The second step is getting a job under the auspices of a physician who will be willing to work with you. He remained certified, correct? He remained certified, but his certificate was modified by the medical director. Let me give an example of that. The actual physical certificate that he received, he receives a physical piece of paper certifying him. He received a physical piece of paper. Was that physical piece of paper modified, or did he simply not, he wasn't able to work where he wanted to work? He was not allowed to practice paramedicine in the department that he had been employed with for about 18 years. That's what occurred. Was that certificate good for other departments within King County? It would be good for other departments within King County were he able to get a job. The facts of the case indicate, the testimony of the chief was, it would be highly... He just couldn't work as a paramedic for the Shoreline Fire Department. He couldn't work as a paramedic any place until he got the permission. No, no, no. You just changed my... He couldn't work as a paramedic for the Shoreline Fire Department. That's correct. That's correct. Maybe, but he could take a certificate and try to get on with another department. He could take the certificate and try to get on in another department, but as the evidence of the case indicates, that was highly improbable that that would ever happen. Highly improbable. The chief of this department, Shoreline, said it was highly improbable that he would ever be employed. Did he ever make an attempt to apply at another department? Is there any evidence in the record of that? There is evidence. There is? Where? Your Honor, there is evidence that he contacted, I believe, the Arlington Fire Department, the Kameno Island North County Fire Department, and a couple of Was that in a declaration, or was that in his... In his testimony, Your Honor. At his deposition? Yes. And that was submitted in the record? I believe it was, Your Honor. Well, the only thing I saw along those lines was the testimony of the fire, of, you referred to the chief. Chief Craigness, who indicated that it was highly unlikely that he would ever get another position as a paramedic in the The chief said, I would agree that it probably wouldn't happen, depending on the circumstances, but not that it would never happen. Unlikely to happen, is what he indicated, Your Honor. You've taken the position that it's a two-step process for one to become a paramedic, and that that's by statute, and that the second step is a doctor has to consent to bring the paramedic under his privileges. That's correct. That's correct. And you say that's statutory, that's pursuant to the revised code of Washington? It's pursuant to the revised code of Washington, and the WAC, the Washington Administrative Code. Is that really, I mean, narrowing this down, is that what you contend the property and liberty interests are in this case? Is that, is that that was, that was withdrawn without due process? Yeah, we contend that what Brian Braswell has is a property interest in pursuing his profession under the certificate, and what was revoked what was taken away was an ability to pursue his profession under the certificate. The job description, as an example, the job description... Why is this any different than, I guess I don't really understand how this is any different than a lawyer who's licensed to practice law in Washington, whose employer fires him, he still is able to practice law if he can get another job or some clients? He doesn't, however, he isn't required to obtain the permission of the presiding judge of the county in which he wants to practice, or of some other person that has a different position than his. He is not required to obtain the permission to in this state, one must obtain the permission of the medical program director or the program medical director in order to practice paramedicine. In this particular instance, the job description of Dr. Summers in this case specifically indicated that he could not even make this decision. It indicated that he, at most, could make a recommendation to Dr. Mickey Eisenberg, the head of the program at the University of Washington, on any issue dealing with modification even of a certificate. Not revocation, not taking the certificate, modification of it. It was modified because he said you can't practice here, and he did it anyway. It's a little like that Reinhart case out of Indiana that was cited in reply to the amicus brief. I think it appears in page three and four of that brief where they had a very similar setup in Indiana where the paramedic could not practice except under the permission of a medical director. And that medical director said I'm not going to let you practice anymore. And the chief said, well, because you're not going to let me this paramedic practice, he's not going to have the right to practice. It was appealed, and there was a merit protection system after that that allowed him to appeal. And the court said, you know, you deprived him of due process because you gave all the discretion to the medical program director to make the decision. In this case, it's even more onerous than that because the decision that was made was made public through the records that were filed that appear in his personnel file and the statements that were made. The program's medical director, Dr. Summers, said to those who listened that Brian was a threat to himself, a threat to the patient, a threat to the community, and a threat to the doctor. Other fire departments within King County, do they have different medical directors? Yes, they do. So Shoreline has its own arrangements with the doctor. It does. And other fire departments have their own arrangements with other medical directors. They do. They do. They do. Is there any language in the statutes or the collective bargaining agreement or in Washington case law that characterizes the paramedic position as an at-will position? No. No. The paramedic position in this case, the basic employment position, is governed, if we're just talking about the employment relationship, is governed by the collective bargaining agreement. And under the collective bargaining agreement, if a paramedic believes that a provision of the collective bargaining agreement, claiming that there wasn't just cause to do so, the collective bargaining agreement, of course, takes the place of some sort of civil service proceeding where a person may appeal up the level of steps to reach, to get to the final decision maker. Counsel, I want to ask you a different question, which assumes, for the purpose of this question, that there was a protected either property or property. Yes. Dr. Grant had two meetings. Yes. In which he had an opportunity to explain his side of what had occurred, one early on and then another one after Dr. Summers had conducted an investigation, one with Dr. Summers present and the first one without. What is insufficient about that process that was given, assuming that he was entitled to due process? Well, first, I don't believe it meets the requirement of Matthews or Coggins or Green, the three cases cited in our brief concerning that. Specifically why? What was the last thing that had to be done for him? Because it wasn't a hearing, and I can explain as the facts relate to this. It wasn't a hearing that was meaningful in any way. It wasn't a hearing, number one. Do you mean there has to be a formal hearing with somebody at the head of the table and witnesses? It doesn't have to be a formal hearing, but it has to have the appearance of fairness, and a person who participates in the hearing has to be a person who is the final decision maker, the final decision maker. And Dr. Summers was not the final decision maker as to the decision to finally disallow Brian's permission to work under his license. Mickey Eisenberg was. Mickey Eisenberg hadn't even seen the letter that was written by Dr. Summers some three and a half weeks after he took his action on December 30th until last July when his deposition was taken. And Eisenberg is the one that makes the final decision on issues concerning modification of a certificate. Well, if you define it as modification of a certificate, Dr. Summers stated in his deposition that he removed your client's, he withdrew his permission. He withdrew his permission. So could someone force him to grant that permission, or was that the final word on his removing his permission? There's no appeal process to address that up to Dr. Eisenberg. There is no appeal. Well, all that suggests is that Dr. Summers is the final word on whether Dr. Summers allows people to operate under his own license. And if that's the case, then why was this an insufficient process? Except that his job description that was part of his contract with the Shoreline Fire Department specifically indicated that he was not the final decision maker in that regard. He could make a recommendation. He could make a recommendation to the King County Medical Program Director, and the King County Medical Program Director is Dr. Eisenberg. And that's what his job description says. It is part of his contract. And so Dr. Eisenberg wasn't there. Dr. Eisenberg didn't know about it, and Dr. Eisenberg didn't even see the letter, as I indicated before, until last July when his deposition was taken. Was Mr. Braswell told before the two meetings took place that the powers that be were considering withdrawing his privilege to work under Dr. Summers' license? Did he know that going into these meetings? He did not. He didn't know it going into the first meeting. He knew it going into the second meeting. He was told that there was going to be a second meeting and that Dr. Summers would be there. And at the end of the first meeting, Deputy Chief Jones indicated that there would be further investigation and he would get back to him. So he knew when he went to the second meeting what it was about. He didn't know. He knew what it was about, but he knew that Dr. Summers was going to ask him questions about that incident, but he certainly didn't know that Dr. Summers was contemplating or was going to revoke the permission to work under Dr. Summers' license. That was never indicated to him at all. At that second meeting, was his union rep representative? No. How about the first meeting? No. I thought somebody was there from the union. He was not told. The first meeting, excuse me. The first meeting, he was not told that he could have a union rep and he didn't. And I believe the second meeting, I'd have to refresh my memory, but I think the second meeting the union rep was not there. You may want to save your minute and a half or so for rebuttal. A minute and a half. Thank you very much. Good morning, Your Honors. May it please the Court. My name is Kara Masters. I represent Dr. Gary Summers. I will be splitting my argument time with counsel for shoreline, so I'll be using seven and a half minutes. There are three points that I want to focus on. First of all, as the Court has noted, there is no property interest here because there is no law, rule, or understanding that creates a legitimate claim of entitlement to a paramedic position. And the Court asked some questions about the paramedic position that I will address shortly. Secondarily, there is no liberty interest because Mr. Graswell did not lose his job. There was no public disclosure of stigmatizing statements that impugned his honesty or his morality. And finally, we believe that third, there was due process, that Dr. Summers gave him all the process. He was due under the circumstances. Will a lot of firefighters compete for the paramedic positions? Your Honor, as I understand it, it's an application process that the firefighters for shoreline, unlike the firefighters in the Reinhart case, are hired under a collective bargaining agreement only to be firefighters. In the Reinhart case, it was a firefighter paramedic position. That's why she lost her job. Here, the job is firefighters. Paramedic is a sort of a premium pay people or a premium position that people can apply for that's a subset of the firefighter class. I guess my question is, are there always more applicants than there are openings for the paramedic positions? Well, I believe that there is an annual process where individuals who are interested can apply for the position. I think it varies depending on how many paramedics there are at any given time. For instance, one year, there will be two openings. One year, there will be three openings. It just depends on what the needs are for the department. I don't know how many applicants there are for any given year. I don't want to disrupt your argument, and this can be very quick, but I read the briefs, in particular, page four and five, summary facts in your brief. Is there something missing here? Dr. Summers concludes that Mr. Braswell has an anger management problem, and yet Mr. Braswell goes, here's a fellow who's not complying with the directions of the paramedic. Looks like he's trying to pick a fight. He gets up and throws something at the desk. He's shuffling through the desk, giving everyone the apprehension that he might be looking for a weapon. From what I can see in the record, all Braswell says to him is, can we have a little less attitude? Now, if somebody's got an anger management problem here, it doesn't look like Braswell to me. Well, Your Honor, I think that if you look at what Dr. Summers did, and this goes to the process that he gave him, he looked at the investigation that Shoreline did, because Shoreline, as the employer, had the responsibility for gathering information. He read the statements from the other individuals on the scene. He read the medical incident report forms from both the initial call and the call when they went back to check on Mr. Davis. He spoke with Sean White. He read Mr. Braswell's statement, and Mr. Braswell does say, a little less attitude. And, you know, it's clear from all of those statements, from all of the statements that were collected relating to this, that there was an escalation of hostility, and Mr. Braswell, instead of de-escalating it, which is the obligation of a paramedic, participated in it and further irritated the process. Well, here's my question. Suppose your client made a mistake that, really, he shouldn't have ended Mr. Braswell's opportunity to work with him. Does that affect the analysis of whether he had a property right in this particular position? Your Honor, I don't believe it does. Mr. Counsel has indicated that there was a modification of the certificate. Dr. Summers' actions and his oversight was, you know, separate and apart from the certificate, and his oversight itself wasn't part of, it wasn't part and parcel or tied to. So his decision to withdraw his oversight wasn't actually a modification. As far as- I guess what I'm really getting at is, even if someone in his position has a legitimate grievance under the collective bargaining agreement about being shunted to a different position without just reason, does that necessarily affect the analysis of the constitutional question? I don't believe it does, Your Honor. And I think, actually, if you look at what's required for a property interest, there has to be some specific law, rule, or understanding. What Counsel has argued is that the two Washington Supreme Court cases, Nguyen and Ongam, recognize a property interest and a license. And he's asking this Court to extend those cases to recognize a property interest in a particular job assignment. The paramedic designation is a job assignment within the Shoreline Fire Department. And the Nguyen case, if you look at the concluding paragraph, recognizes the difference between a property interest in a license or certificate and a property interest in a specific job assignment. In fact, it says that the license and certificate interest is more than a right to a specific job. And what Mr. Braswell's argument presumes is that those cases will extend to this specific job. So we don't believe that there's any source to create a property interest in the paramedic job assignment here. Go ahead. Finish your- I was going to say, there's also nothing under the collective bargaining agreement that creates a right to become a paramedic. And there's also, in the absence of any contract or agreement, Washington law is at will, nothing in at will employment creates a right. So we don't believe that there is anything that would create a property interest. There's nothing more than a unilateral- He also alleges a violation of his liberty interest in employment. And one of his arguments is that, one of his contentions or claims is that, this whole incident effectively precluded him from working as a paramedic. Your Honor, that's true. But we believe- And he points to the evidence of the Chief's testimony at the Chief's deposition. Well, Your Honor, and that's true. That's what the Chief said. I believe you asked earlier whether Mr. Braswell actually applied for a job elsewhere. I know in his deposition, and I'm not sure if this actually made it to the appellate record, I know he mentioned he collected applications from other districts, but he never submitted them because he assumed he couldn't get a job there. He assumed Dr. Summers wouldn't give him a recommendation. That is in our brief. And, Your Honor, I think that the point is, is that he didn't lose his job. He maintained as a firefighter. Well, he couldn't work as long as Dr. Summers was there, the medical director for the Shoreline Fire Department. It's fair to say that he couldn't get a- He wouldn't be able to work as a paramedic there, right? I think at that time, that's a fair statement, Your Honor. But the case law says that, I mean, basically what Shoreline did is what reassigned him from a paramedic job back to a firefighter job. And the case law says that a loss of employment that's enough to trigger a liberty interest has to be more than just a reassignment. It has to be an affirmative foreclosure of other opportunities. And while Dr. Summers withdrew his authority and with his oversight for Shoreline, there was nothing that he did that precluded him from going elsewhere in King County to look for a job, that precluded him from going to other paramedic options. And so we think that the loss of employment problem is not met here. What do you do with the chief statement? What do you say about the chief statement here? I would agree that it probably wouldn't happen, depending on the circumstances. Your Honor, I- But that would never happen. That was- That's the chief. Well, that was the chief's opinion, Your Honor. But Mr. Braswell never took affirmative steps to try and get another job. And without that sort of- He couldn't present any evidence that showed that he was actually foreclosed. He basically presented evidence that he assumed he couldn't get another job. Obviously, the chief didn't think he could get one, so, well, there it goes. There was no other job opportunity. But there was nothing that said, you can't go do this. You can't use your certificate elsewhere. You can't be a paramedic anywhere. Nothing that Dr. Summers said ever foreclosed that. And in fact, there's nothing that actually said he could never be a paramedic with Shoreline again. He said, at this point in time, I consider you dangerous. I consider you, you know, incapable of performing the duties that you need to as a paramedic. So I'm withdrawing- Miss, if you were to go to apply to another fire department within King County, would that information be available to a future employer? Would- The chief's, the doctor's statements about him being dangerous and whatnot. I don't believe so. I believe that one of the requirements for a liberty interest is that there be some public disclosure. And that- Mr. Braswell argues that his personnel file, availability of his personnel file, would create some public disclosure. In fact, the state public disclosure laws don't require that. And I don't believe a subsequent employer is going to get a hold of that letter. So, you know, unless Mr. Braswell tells another employer, another- the department that he's been- Well, there's certainly an inference. Most employers ask for references from previous employment. But it is a few steps removed. It requires him to apply. It requires the new employer to ask. And there is, in most states, I assume in Washington also, a qualified privilege for a previous employer to reveal to a subsequent potential employer the circumstances of someone's departure. But it's several steps removed from now because he didn't make the application. So what you're saying is there's been no disclosure, but one can reasonably assume that there might be if he applied elsewhere. But it's possible. But I think that he doesn't- It's not necessarily true that all of the details of why the withdrawal of oversight occurred would be revealed to a subsequent employer. That's true because a lot of employers won't say. Yes, Your Honor. And I would love to answer any of your other questions, but I want to give my co-counsel her opportunity to argue. We'd ask that the Court affirm the lower court's decision. Good morning. May it please the Court. I'm Christy Goler on behalf of Shoreline Fire Department. In this case, the plaintiff, Mr. Boswell, is attempting to claim a protected property interest not only in the paramedic certificate itself, but the doctor's supervision. And not just any medical program or program medical director's supervision, but in this case, specifically, Dr. Summers' supervision. And the law is clear that only the certificate itself gives rise to a protected property interest. Because he only lost Dr. Summers' supervision, nothing foreclosed him from pursuing employment opportunities elsewhere. And although it may be that it was more difficult or employers might not look upon him as favorably should he try to apply elsewhere, the Board of Regents v. Roth case makes it very clear that just the fact that you might be less attractive to future employers does not give rise to a constitutionally protected interest. With regard to the liberty interest at stake, and particularly the issue involving this reputation for honesty and morality, the cases on point all deal with employees that have been terminated from their position. And even when terminated, that termination has to come close in time to when that letter or whatever information is being placed in their personnel file is close to when the termination took place so that that stigma can apply. The mere fact that those letters and information regarding this investigation is in there currently does not give rise to a violation of a liberty interest. Doesn't Roth say that the placement of stigmatizing information in a personnel file is sufficient to trigger a liberty interest? The cases that the appellant relies upon, and particularly Vannelli and Cox v. Ruskelly all involve situations where the individual was terminated and that termination came very close in time, if not immediately upon that information being placed into their personnel file. The appellant admits that Shoreline itself had no control as far as allowing him to continue in his paramedic position once Dr. Summers revoked his authority for him to practice under his license. Was that Dr. Summers that actually had the final say? Or was it the medical director? The King County Medical Director? The King County Medical Director has the power to delegate his authority to supervise paramedics to the individual program medical directors in that county. So in that delegation of authority, that authority now rests with Dr. Summers. And because it's Dr. Summers' license that's at stake, because it's his medical license that he has at stake when he is allowing someone to practice paramedicine under that license, the authority should rest with him. And in fact, we have Mr. Braswell claiming that he has a protected interest specifically in Dr. Summers' permission and wants to restrict his ability to decide how he wants to use his own medical license and could result in him being forced to continue to supervise a paramedic that he no longer has confidence in, has doubts about how he will serve the public. And for public policy reasons alone, should Mr. Braswell prevail, I think we will find that a lot of program medical directors are no longer going to want to serve or even risk entering into that relationship with paramedics. Did the medical director have the authority to alter the outcome? I do not believe so. I believe it had the license or a certificate had been suspended or revoked or modified in some way, yes. But in this case, despite appellant's contentions, the certificate itself was not modified. He was not suspended. It did not limit his qualifications as a paramedic in that regard. He merely lost one program medical director's permission. So in this case, he's not just claiming property interest in every program medical director everywhere. He's claiming it specifically from Dr. Summers in this case. Your time has expired. Thank you, Counsel. Thank you. I'll talk real fast for a minute and a half. First of all, there are hundreds if not thousands of applicants nationwide and in the state of Washington for each paramedic position that is out there. And there may be as many as four or five hired or as few as one, depending upon the passage of a levy of some sort and the funds available to hire the paramedics. There are thousands applicants for each position. And the reason is the position, what they're able to do, the training involved, and quite honestly, the salary and the huge overtime that paramedics get because their schedule is dictated by events rather than an hourly schedule. The other thing that I think needs to be emphasized is that Brian ended up losing his certificate here. He lost his certificate because he couldn't renew it. These certificates in the state of Washington have to be renewed every two years. And to renew a certificate, you have to take classes and be employed as a paramedic. If you're not employed as a paramedic, you lose your certificate to be a paramedic or to relicense yourself. And he's lost that license. It's gone. Because he was not employed as a paramedic and therefore couldn't go get the practicums that are required to recertify. So he lost that within two years after this event occurred. Number three, or whatever number it is, this is widespread knowledge about what happened to Brian Braswell. Evidence of that is the University of Washington's amicus brief and the King County EMS. And I think there are multiple other... Counsel, the fact that your filings in this case are public, so that fact doesn't bear on what evidence there is in the record that the specific defendants here said anything publicly. What in the record demonstrates a public statement... Yeah, they have made public statements. What in the record, point me to a page in the record where there is a statement made to the public. I cited in the brief your honor, Rick White's testimony. Rick White is the president of the Shoreline Firefighters. Rick White testified that at a meeting with paramedics and others in the department, not dealing with this disciplinary or revocation issue, Dr. Summers said Brian Braswell is a threat to himself, to patients, to the community, and to me. And he will never practice under my license and my intent was to get him out of the position as a paramedic. That's in the record and that's cited specifically in the brief. That's Rick White, president of the Shoreline Firefighters Association. And secondly, the issue about going into the personnel file under our laws, these letters are discoverable. There is no ongoing investigation. If there's an ongoing investigation that deals with personnel in the state of Washington, the information is not a public document. Once it's concluded, it's a public document. And we've indicated that in our brief. It is available for anybody to come and request and the Shoreline Fire Department is required by state law, our Open Public Meetings Act, to give that document to you. Thank you, Counsel. You've exceeded your time and we understand your position. We appreciate the arguments of all counsel and the case just argued is submitted.
judges: Burns, Graber, Paez